IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2025

**IN RE BRADFORD H.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT 268827      Sheila Calloway, Judge**

_____

**No. M2024-01432-COA-R3-PT**

_____

This appeal involves the termination of a mother's parental rights to one of her five children. After a five-day termination trial, the trial court found by clear and convincing evidence that two grounds for termination were proven and that termination was in the best interest of the child. We vacate one ground for termination but otherwise affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and JEFFREY USMAN, JJ., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Angela H.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.   FACTS & PROCEDURAL HISTORY**

Angela H. ("Mother") first became involved with the Tennessee Department of Children's Services over two decades ago, long before the child at issue in this appeal was born. Sadly, her main struggle at that time and throughout the lives of her children has been an addiction to cocaine. The child at issue in this appeal, Bradford, is the fourth of Mother's five children (the second youngest) in order of age.

We will briefly review Mother's history with DCS before Bradford was born, to demonstrate Mother's long-running battle with cocaine addiction. In 2002, two of Mother's three oldest children were adjudicated dependent and neglected due to her drug use. According to the order, Mother had recently delivered her third child and tested positive for cocaine and marijuana. She had also reportedly tested positive for cocaine and marijuana on three other dates earlier that year. Mother's oldest son, who was eight years old at the time, was living with his father, but Mother was caring for a young daughter and the infant son. She was interviewed at the hospital and admitted that she had a drug problem and had been using drugs for a couple of years. She reported that she had been in drug treatment programs but relapsed after returning to the same environment where drugs were available. Mother's younger two children were adjudicated dependent and neglected "due to the drug use by their mother." The order stated, "[Mother] is in need of intensive drug rehabilitation if she is to effectively parent her children." She had entered a drug treatment program and then moved in with her sister while attending yet another program, which she agreed to complete.

Three years later, in 2005, additional dependency and neglect proceedings were instituted by DCS regarding the same three children. This resulted in an order adjudicating all three children dependent and neglected. According to the order, Mother acknowledged that the children were dependent and neglected "due to her relapse on drugs." The order stated that a permanency plan had been approved and that Mother had six months to substantially accomplish the tasks listed on the plan in order to have the children returned to her. The order noted that the oldest child had already been placed in the custody of his father and that the two younger children would remain in DCS custody.

In 2008, an order was entered adjudicating Mother's daughter dependent and neglected and a sexually abused child due to sexual abuse that had occurred in 2006. The perpetrator was Mother's live-in boyfriend, Anthony. The order stated that "[Mother] has been indicated by DCS." It stated that the daughter would remain with her "current custodian."

Bradford was born in 2009, and his father is Anthony, the perpetrator of sexual abuse against Bradford's older sister. It appears that Mother's three older children also returned to her home around this timeframe. Mother also had a fifth child, another daughter, who was born in 2014. Another petition for dependency and neglect was filed after Mother delivered the child at home, and she and the child tested positive for cocaine. This petition concerned only the four youngest children, as the oldest brother had by then reached the age of majority. An agreed order of adjudication and disposition was entered. According to the order, when a case manager met with Mother at the hospital in June 2014, Mother stated that she already knew why she was there, "because of what she and her baby had in their system from her 'birthday celebration.'" Mother characterized this as a "relapse" and said that "she had not used drugs since January." She reported going to "detox" in February 2014 at Vanderbilt. Mother also reported that "she had been to

inpatient drug treatment at Bradford, as well as outpatient in 2009," and she went to a treatment center called "Foundations" twelve years earlier. Mother stated that she had also looked into other treatment options at three providers, but none of them had an outpatient program that would allow her to pick up her son from school in the afternoons, and she did not have reliable transportation. Mother said she had been "diagnosed as bipolar" and was prescribed medications. The order noted that Mother had an "extensive history" with DCS dating back to 2001. The order declared Bradford and his minor siblings dependent and neglected, and it also declared the infant daughter an abused child due to substance abuse during pregnancy. The order, entered in October 2014, set the matter for post-dispositional review in December, and Mother was ordered to comply with services requested by DCS in the meantime.

Before the next hearing was held, however, DCS filed a petition for custody and emergency removal of the four children, in November 2014. According to the petition, DCS had maintained an open case with the family to continue monitoring and administer drug screens. The petition stated that Mother had recently tested positive for cocaine on a random drug screen, which she admitted to using days earlier. The petition stated that, due to Mother's "continuing drug use," an immediate protection agreement was implemented, placing the children with another individual as a less drastic alternative to DCS custody "until such time as [Mother] has addressed her illegal drug use." However, the individual had already informed DCS that she could no longer provide placement for the children, so they were removed to DCS custody. The petition asked the court to enter a protective custody order placing the children in DCS custody and ultimately declare all four children dependent and neglected due to Mother's use of illegal drugs. That same day, the court entered a protective custody order placing the four children in DCS custody.

The oldest daughter subsequently reached the age of majority. In 2016, DCS filed a motion seeking to be relieved of custody of the three minor children and to have permanent guardianship established with Mother's sister. The motion noted that DCS had been the legal custodian of the children since November 2014, but it stated that the children had been residing with their aunt for at least six months. The motion stated that reunification with the parent was still not in the best interest of the children, but permanent guardianship was in the children's best interest. In September 2016, an order was entered granting permanent guardianship to the aunt. Unfortunately, however, this placement lasted less than a year for Bradford.

Around July 2017, DCS filed another petition for custody and emergency removal of Bradford. The petition stated that the aunt had abandoned Bradford's older brother in February 2017, and in July, she abandoned eight-year-old Bradford as well. The aunt accused Bradford of behavioral issues and disrupting the home. Child Protective Services spoke with the prior family services worker for the family, who reported that she "had spoken to [Mother] several times and [Mother] had stated she was not willing to stop doing drugs so that the children could return to her custody." The court entered an emergency

- 3 -

protective custody order granting custody of Bradford to DCS based on the sworn allegations of the petition. It appears that this petition was also ultimately granted, with Bradford again being declared dependent and neglected and custody remaining with DCS.

A permanency plan was developed for Mother in August 2017, with responsibilities aimed at reunifying her and Bradford. The permanency goals were return to parent or adoption. The plan stated that Mother was interested in working the plan to receive custody and had a good relationship with her children. However, it noted her history of drug use and mental health diagnoses of bipolar disorder and post-traumatic stress disorder. The plan stated that "Mother has solicited the help of service providers to assist in the custody process[.]" As for Mother's responsibilities, the plan first required her to "complete the required classes that she has been mandated to take through Metro Social Services (anger management, life skills, and conflict resolution)," maintain part-time employment and participate in case management services "as mandated by Metro Social Services," and "complete the 15 day program at Buffalo Valley as required by Metro Social Services and follow all recommendations." The plan stated that DCS would receive updates from Metro Social Services regarding her progress. Next, the plan required Mother to submit to random drug screens. It also required her to complete a mental health assessment "with a parenting component" and follow all recommendations. She was required to maintain sufficient income to support herself and Bradford. "Upon recommendation from service provider," the plan provided that Mother and Bradford would participate in family counseling to address parent-child dynamics. Finally, the plan required Mother to maintain contact with DCS and notify it of any changes to her contact information.

A revised permanency plan was developed approximately six months later, in February 2018, with largely the same responsibilities for Mother. After a permanency hearing in August 2018, an order was entered stating that DCS was making reasonable efforts toward reunification but Mother was not making progress. Although the handwriting on the order is nearly illegible, it appears to state that Mother had not visited since February, she was nonresponsive to messages, she had not submitted to drug screens recently, and though she reported completing some other task, which we cannot decipher, "no documentation has been provided." Thus, the order noted that Mother had "no documented proof of compliance with most tasks." Mother was also arrested for driving under the influence in 2018 due to the amount of cocaine in her blood, and she was placed on probation.

A third permanency plan was developed in February 2019, largely listing the same tasks for Mother, but adding a new requirement of four hours of visitation per month. After another permanency hearing in March, an order was entered stating that DCS was making reasonable efforts and Mother was making progress. Again, the handwriting is barely legible, but it appears to state that Mother was doing very well with probation, passing

screens, compliant with mental health treatment, and had employment.[1]  The order states that a motion for a trial home visit was expected to be filed that day, but prior to court, Mother failed two separate instant drug screens for cocaine.  Mother had denied cocaine use after the first screen, she was screened a second time and failed again, but she still wanted to contest the results of the instant screens.  She claimed that she had passed drug screens given by her employer and her probation officer in the past week.  The court's order stated that "mother is in substantial compliance" with the exception of the two positive instant screens that day.  It stated that Mother and Bradford were ready for a trial home visit if the drug screen issue was "cleared up," so she needed to have a lab screen that day.  The order stated that the trial home visit may be granted if the lab screen showed that the instant screens were false positives.

In December 2019, a fourth permanency plan was developed.  This plan stated that Mother had been accepted into an inpatient alcohol and drug program.  The plan required Mother to "maintain sobriety and continue to pass all random drug screens."  In the section of the plan regarding Mother's drug use and mental health diagnoses, it stated, "[Mother] has completed her programs, and is about to start another one. . . . [Mother] has completed this program and followed recommendations by going to an inpatient program."  In the section of the plan regarding Mother's solicitation of help from service providers and requirements through Metro Social Services, the plan stated, "[Mother] is actively working with the Department in order to gain custody."  It further stated, "[Mother] has employment, and has expressed to the Department that she has taken the required classes."

In February 2020, Mother successfully completed the residential treatment program at a facility in Florida called River Oaks.  Shortly thereafter, Mother was approved to have a trial home visit with Bradford's older brother, who was seventeen years old at the time, with the understanding that Bradford might be able to return home if the brother's visit went well.  The visit did not go well, however, as Bradford's brother was arrested in another state and charged with a felony just two months after the trial home visit began.  He was ultimately tried as an adult, found guilty, and sentenced to years of incarceration.  Mother admittedly relapsed again after the brother got in trouble.

Bradford was placed in his current foster home in October 2020.  A fifth permanency plan was developed in February 2021, although it is not in the record before us.  A permanency hearing was held in March, and the permanency hearing order entered thereafter states that DCS was *not* making reasonable efforts toward reunification because it had not requested a drug screen from Mother in a year.  Mother testified that she had completed inpatient drug treatment in Florida and returned to Tennessee in February 2020, and she had not been asked to submit to a drug screen since February or March 2020.  Thus,

---

[1] This Court has urged "judges and litigants to be thorough in the preparation of orders, especially when the rights of parents and minor children are involved."  *In re Jaylah W*., 486 S.W.3d 537, 554 n.18 (Tenn. Ct. App. 2015).  For the same reasons, we urge judges and counsel to ensure that orders are legible.

the order stated that Mother had "not been consistently drug screened recently due to no fault of her own." The order noted that Mother had reportedly completed inpatient drug treatment in Florida and a parenting assessment, but DCS needed to obtain the records from those programs. Mother testified that she had been clean and sober since April 2020, when she had used marijuana, but she was attending virtual NA meetings weekly. She had recently suffered a hand injury at work and was prescribed narcotic pain medication.

DCS began drug testing Mother again in the months thereafter. In June 2021, she tested positive for cocaine. In December 2021, Mother's caseworker spoke with her on the phone about coming to the DCS office to sign a release and bring copies of her lease and check stub. The caseworker also planned to drug screen Mother. Mother said she needed a ride, so the caseworker drove to Mother's home at the appointed time, but no one ever came to the door even though a car was in the driveway. A sixth permanency plan was developed a few days later. Mother was drug screened at the DCS office and tested positive for cocaine. She became upset and left before the meeting was completed. The sixth plan again contained largely the same responsibilities for Mother.[2]

In March 2022, DCS filed a petition to terminate the parental rights of Mother and Bradford's father. The petition asserted that grounds for termination existed due to Mother's substantial noncompliance with the permanency plans and her failure to manifest an ability and willingness to assume custody.[3] It also asserted that termination of parental rights was in the best interest of Bradford. Mother continued to test positive for cocaine while the case was pending. During this time, Bradford expressed to his DCS case manager that he was interested in being adopted by his foster mother. The permanency plan was revised again, and the dual goal of return to parent was stricken because Mother was "making no progress."

After some continuances, the termination trial finally began in February 2024. Bradford, who was fourteen years old by the time of trial, was the first witness to testify. Although counsel for DCS initially took the position that Bradford should testify outside of Mother's presence with only the attorneys present, Mother insisted on being present for his testimony, and Bradford indicated that he would be comfortable testifying in her presence. Bradford was currently in the ninth grade. He testified that the last time he lived with Mother was when he was five years old, about nine years earlier. He had remained in foster care with the exception of the brief period he lived with his aunt. Bradford had been living at his current foster home for about three years. He lived with his foster mother, her

---

[2] In her brief on appeal, Mother states that some of the permanency plans entered as exhibits were not signed by a magistrate or judge. However, in her answer to the termination petition, Mother admitted that the first five permanency plans were ratified. The December 2021 permanency plan in the record contains a blank signature page, so it is unclear whether it was ever ratified.

[3] Two other grounds for termination – abandonment by failure to visit and abandonment by failure to support – were asserted in the petition but are not at issue on appeal. DCS withdrew one ground prior to trial, and the trial court found that the other was not sufficiently proven.

adult son and his five-year-old daughter, and twin seventeen-year-olds who were also foster children. Bradford testified that he had a good relationship with the foster mother and that she provided everything he needed. He described the home as a happy environment and a family environment that he enjoyed. Bradford testified that his favorite things about the home were that he had the ability to "do a lot of stuff," go outside, or relax. He also added, "I have somebody to take care of technically, because I always play with her son's daughter[.]" At school, Bradford played on the football team, and he played drums in concert band and modern band.

Bradford said he understood that the purpose of the hearing was to terminate his mother's rights as a parent. He described his relationship with Mother as good and said that he loves her. He said his foster mother gave him a phone and allowed him to have phone calls with Mother anytime, so he was able to talk to Mother whenever he wanted. When asked what he would like to see happen with his case, Bradford responded, "I want to go home. But it's just like everything that [the foster mother] does, but . . . ." He also noted that all of his friends were at his current school, so moving would require him to make new friends. Counsel asked, "So if the opportunity presents itself, ultimately you would like to go home because you love your mom; right?" Bradford responded, "Yes." When asked to list some reasons why he felt that way, Bradford said, "Because that's where I belong. . . Because it's my home." He did not know who lived with Mother but thought his older sister might live there. Bradford was also asked, if he was not able to go home for whatever reason, if he would feel comfortable staying at his current foster home. Bradford said he would, and he also testified that he would be okay with being adopted if that option was presented. Counsel then asked if it was accurate to say that he "would rather go home," but if that is not an option, he is "okay with being adopted by [his foster mother]," and Bradford responded affirmatively. Bradford testified that he had discussed this plan with his foster mother "[a] little bit," and even if he was adopted, he could continue having regular contact with Mother. He testified that his foster mother was supportive of his relationship with Mother.

On cross-examination, Bradford was asked again if his "preference" would be to "go home" and live with Mother, and he confirmed that it was. Bradford said he had believed over the years that he would be going back home, but that never happened. He recalled one period when he was able to visit Mother "for a couple of months going on weekends," but then such visitation "suddenly stopped." When asked if he and Mother currently had in-person visits, Bradford responded, "No. We did one." He said that visit was "[k]ind of recent" and at "a DCS office or something." He said that the foster mother "doesn't really care" if Mother stops by to visit at her house as long as she calls first. He testified that he and Mother talked on the phone about once a week. He said he occasionally talked to other family members, such as his older brothers and grandmother, but that was "about it."

The next witness to testify was the foster mother. Due to some medical issues, she

was permitted to testify remotely. The foster mother testified that Bradford had been living with her for about four years. She had been a foster parent for 37 years. The foster mother testified that she lived with her adult son, who was in his thirties, and his daughter. She testified that the twins were almost 18 and would be "going home" soon, but they wanted to stay at her home until they finished school.

The foster mother testified that Bradford was a great child, and she "never had any trouble [] out of him." She said, "He just took right up with us." She testified that Bradford had previously participated in mental health services, but "he just didn't need them." He had no behavioral issues at school, and she made sure he worked to maintain his grades. She said he loved football and also played in the band. In the event that she was unable to attend his events, she noted, "my son goes to every one of them." She testified that her adult son, who also played football, took Bradford to all of his games and practices and supported him "a hundred percent." She said that her son's five-year-old daughter "loves [Bradford] to death" and always wants to play with him, so they play outside together. The foster mother wanted to adopt Bradford if that became an option. She also testified that if anything happened to her, related to her health, her son was going to "take Bradford" and be there for him. She said that her son did not want Bradford to go anywhere else, and Bradford did not want to go anywhere else. The foster mother testified that her son loved Bradford, and they had a great relationship. She said it would break her heart if Bradford had to leave because "he loves it here" and had "really become close to all of [her family]."

When asked about the extent of her interaction with Mother, the foster mother testified that she never really came around. She described a couple of instances in which Mother came by her house and dropped off a birthday gift or had a picnic outside. However, the foster mother testified that she and Mother did not talk on the phone or communicate regularly. She testified that Mother is "hard to have a relationship with, because she'll be talking, and then she just goes off." She explained that Mother would "just get mad and say I'm trying to take her child or something. I don't argue. I just let her go ahead with it." The foster mother testified that Mother had "acted up" and "gotten . . . heated" with her before and said "she's got a temper or something." The foster mother explained that she would never try to take a child from a parent and that she liked to see children go home with their parents because they always came back to visit her. Still, she testified that she wanted what was best for Bradford and had concerns about him returning to Mother's home because she worried whether Mother would "be there when he needs her." She testified that she wanted Bradford to be stable and safe, and she wanted him to be adopted into her family "because all of us love him to death." She said Bradford had been with them so long he was "just like our child." The foster mother confirmed that she intended to allow Bradford to maintain contact with Mother even if he was adopted, recognizing that he would still love his mother.

This concluded the testimony on the first day of trial, and the trial judge ordered Mother to submit to a drug screen. She tested negative for all substances. Mother was the

first witness to testify on the second day of trial, which was also in February 2024. Mother was 47 years old at the time of trial. She testified that she lived alone and had maintained the same residence for eight years. Mother testified that she received workers' compensation for almost two years after she injured her hand, but this had ended in January 2023. She was currently employed as a caretaker who would "sit with" patients who had medical issues. She testified that she held a certification as a "certified nurse's technician." Mother had only been working for her current employer for about three months. She testified that she had no idea how much money she earned but guessed that it was about $2,000 per month. Mother resided in Section 8 housing. She testified that she also worked for a ministry that provided services for people such as cooking or styling hair, and she earned anywhere between $1,000 and $3,000 per month from that work.

Mother testified about her five children as well. The three oldest were in their twenties by the time of trial, Bradford was 14, and his youngest sister was 9. She continued to live with her aunt but visited Mother often. Mother conceded that all five of her children were at some point removed from her care because of her drug use. She acknowledged that her older daughter was also found to have been the victim of sexual abuse by Mother's live-in boyfriend, Bradford's father. Despite the finding of abuse, Mother still wanted Bradford to have a "relationship" with his father "so that Bradford can know his dad." However, he resided in California.

Mother described the timeline of events regarding Bradford's time in her care and with DCS over his lifetime. She testified that she was using drugs around the time of Bradford's birth in 2009 and went to Alabama to a program called Bradford Health Services. Mother explained that she was "carrying Bradford" while in Alabama, but she moved back to Tennessee before he was born. She testified that she maintained her sobriety for a year or so thereafter. Despite the earlier proceedings involving DCS and her older children, Mother testified that DCS first became involved with Bradford in 2014 when her youngest child was born drug-exposed. She testified that she went to "Park Center" for treatment around that time. When asked about her subsequent positive drug screen that led to DCS filing the petition for emergency removal, Mother said she had used cocaine because an aide was mistreating her mother, so she "chose to go get high" because she "was about to kill her." Mother testified that the children remained in DCS custody for the next two years, then went to live with her sister for a short time before Bradford was returned to foster care.

Mother also testified about the trial home visit with Bradford's older brother in February 2020. She acknowledged that the plan was for Bradford to come home in June if all went well. However, Mother said that she lost her mother in April, and ten days later, the child got in trouble. She explained that she was simply watching television with him, when he went out of the room and evidently got into a vehicle that was pulling off. She said, "I didn't know he was gone or anything. And I guess four days later, I got a call to tell me my son had been arrested in Georgia." The brother remained in jail at the time of

- 9 -

trial, and Mother did not know how much longer he had to serve. Mother admitted that DCS did not place Bradford in a trial home visit with her due to the situation with his brother, but she believed this was unfair. She denied responsibility for what occurred and insisted that Bradford's brother made his own decision, and "it had nothing to do with his mother."

Mother testified that her drug of choice was cocaine and that she first started using it in 1998 at the age of 22, roughly twenty-five years before trial. She testified that she sought help long before any involvement with DCS. She estimated that she had attended about twelve rehabilitation programs. She listed six but said she had been to a few of those twice. She testified that she also participated in drug court for a short time, but she got out of the program to care for her mother. Mother testified that she had been able to maintain what she characterized as a long period of sobriety maybe three or four different times. She also testified that she was "doing well at this moment" and could not recall the last time she used cocaine. However, Mother admitted that she had tested positive on a drug screen for DCS in the past year, and she also conceded that "a lot of times they didn't have to test me. I just told them[.]" She was not currently participating in any alcohol and drug treatment, but she was attending NA meetings after work. The last time she had successfully completed an alcohol and drug treatment program was in Florida in January 2020, four years before trial, and Mother admitted that she had tested positive for drugs since then. When asked about attending any additional alcohol and drug treatment, Mother said she "could probably teach one" by now. Mother insisted, "I have all the tools and the materials that I need. . . . I don't feel the treatment is necessary[.]" She testified that she had already completed three or four alcohol and drug assessments "since this begun," and she had completed another assessment while the termination case was pending and was told that she did not need "to actually go into treatment" and could use the tools she had already been given. However, when asked if she had a copy of that assessment with her, Mother said she did not. She said it took place at Centerstone. Mother insisted that she had "done the homework" and had the tools to stay clean and sober, so Bradford should be returned to her. She acknowledged there were times she became depressed and relapsed but said her relapse plan was to continue taking her mental health medication, utilize support groups, attend meetings, speak with her sponsor, etc.

Mother testified that she had been diagnosed with bipolar disorder and took three medications for depression and anxiety. She testified that she attended mental health counseling at Centerstone and saw a psychiatrist there. She said she last completed a mental health assessment around 2019 or 2020 while in Florida, and documentation was provided to DCS at that time. Mother said she had complied with its recommendations to take her mental health medication and see a therapist when she needed to talk. The last time she saw someone at Centerstone was in October, four months before trial. When asked if she had any documentation showing she had signed a release at Centerstone, Mother said, "At this time, no, I don't. Every time I bring it, no one seems to want it."

- 10 -

Mother testified that she completed a parenting assessment in 2017. She said it was "provided through the State" and completed in her home during a visit with Bradford when she had a different DCS caseworker. She estimated that she had, over the years, at least six different DCS caseworkers. Mother testified that her program curriculum at the facility in Florida included parenting classes, even though they were not required by her permanency plans. She testified that she had maintained stable housing and had only changed her address once. Mother testified she had recently learned that her driver's license had been suspended since 2017. She was working to get it reinstated but was driving in the meantime anyway. She said, "My ability to drive . . . [is] not determined [by] whether or not I've got a piece of plastic[.]" As for employment, Mother said she had provided information about her last job to a previous caseworker and that he had come to her place of employment to administer drug screens. She said she was unemployed for a year due to her hand injury, when she received worker's compensation, and she had obtained her current job a few months before trial. She said the current caseworker was welcome to come to her home to drug screen her and simply had not done so. Mother testified that she complied with requests for screens when asked, and she could only recall one occasion when she refused because she was on her way to a doctor's appointment.

Mother claimed there were periods throughout her case when she could not get responses from caseworkers or did not have a caseworker. She testified that she had done everything the permanency plan asked her to do "[u]p until" the termination petition was filed. Around that time, Bradford's former caseworker passed away, and the current one took over the case. Mother testified that the current caseworker did not communicate with her regularly. She explained that "she and I didn't seem to get along on a couple of conversations, and so if she did not contact me, I didn't contact her." Mother also testified that the current caseworker "hasn't asked me for anything, and so she doesn't get anything." Mother said she had lost faith in DCS. As Mother put it, she finally decided, "Was I going to deal with DCS? No." She explained, "After [the previous caseworker], I simply lost all faith in this situation . . . I just don't deal with them, period."

Mother testified that her last in-person visit with Bradford was around Christmas, about seven weeks before trial. She testified that there was never any time period when she did not visit regularly when allowed. Mother initially testified that ever since Bradford had been living at his current foster home, her visitation and communication had been "hindered." However, she later testified that she had stopped communicating with DCS about visits due to her frustration and resorted to calling the foster mother instead. Mother then conceded that the foster mother had, for the most part, been open to her coordinating to come to her home to visit Bradford at her convenience. She also testified that she maintained communication with Bradford through video calls or phone calls, and she admitted that the foster mother allowed them to have phone contact freely and at any time. She estimated that they spoke once a week. Mother testified that if her rights were terminated, she expected that she would "still be able to maintain [her] contact or relationship with him as it is currently." She admitted that she did not attend any of

Bradford's football games during his freshman year. She claimed that she did not have the schedule until late in the season, planned to go to one that was cancelled, and did not have transportation for another. Mother testified that she did not attend any band performances because no one told her about them.

Mother was also asked about her parenting abilities and how her cocaine addiction impacted her ability to parent. The following exchange occurred:

> Q. Do you think you have any parenting deficiencies?
> A. The deficiency is not having my children, not being able to communicate in their lives. See, my children were taken because of my urine and not because of my parenting skills. There was no other grounds for my children to be removed except my urine was dirty. So I don't really think my parenting skills was at question.
> Q. So you don't think using cocaine is a reason that DCS should take kids into foster care?
> A. I understand that that's the reason that was given, but also in court that was said to me in the other courtroom. The only grounds for taking my children was that I had dirty urine. My children were not neglected. . . .
> Q. So do you see any problem -- do you think you have a drug problem?
> A. I have a drug addiction. We know this. This is a thorn in my flesh. That's been a problem since I started. And as I stated, before DCS ever got involved in my life, I was seeking help for this issue.
> Q. Okay. But just so I'm understanding your testimony, you don't think that a drug problem is a problem that goes into your parenting?
> A. I think that a drug problem, it affects every aspect of my life. And that's why I work hard towards finding tools and ways to function as a normal person in spite of this problem. I'm trying to overcome it. I'm doing everything that I need to do. Do I think that my drug problem should keep me from my children? No.

Mother was asked why it had taken her so long "to get on the right track to be sober." She responded, "I've been on the track but fallen off. Part of recovery is relapses. It's a process." Mother said she believed it was unfair to take her children away because her drug addiction was a disease. She believed that Bradford needed to be at home with her because she was his mother and "with his mom is where he belongs."

Mother was asked about her recent drug screen results and admitted that she "[p]robably" did test positive for cocaine when screened at court in March 2023, a year after the termination petition was filed. She also admitted that, when drug screened at her home in October 2022, she signed the screen acknowledging that she had tested positive, but Mother testified that a "faint line changed" later which meant that she had actually passed. She claimed that the same thing had happened on another occasion recently, when

the test result was marked as positive and it should have been negative. Mother conceded, however, that she had tested positive for cocaine in June 2021 and in December 2021, just a few months before the termination petition was filed. She acknowledged that all of these drug screens were at pre-scheduled court dates or visits with the exception of the one at her home, which was a random screen. Still, Mother noted that her last failed drug screen was almost a year before trial. She had tested negative at her recent visit with Bradford in December 2023.

At the conclusion of the second day of trial testimony in February, the parties were directed to return in April. Thus, Mother resumed her testimony two months later. She testified that since the last court date in February, she had visited with Bradford and also talked to him by phone. She said she had gone to the foster mother's home to visit Bradford "[t]he day we left court," but she had not visited him since. Mother had also been asked by her caseworker to take a random drug screen in the period between the court dates, but she did not complete it. She testified that she ran out of gas on the way to the office. She explained that she had to walk to get gas and "did not want to be bothered with her at that point." Mother admittedly "told her I was going home." She acknowledged that her caseworker sent her a message offering to come to her home. Mother testified, "I told her, I ran out of gas; I am going home, and I do not want to see you."

The following exchange occurred immediately thereafter:

A. Does that answer your question? Do you have your information?
Q. Ma'am --
COURT OFFICER: Ma'am, ma'am.
Q. (By [Counsel for DCS]) Are you on drugs today, [Mother]?
A. No, I'm not.
Q. So you just took a drug screen --
A. I sure did.
Q. -- and you were positive for cocaine and --
A. If that's what it says.
Q. -- propoxy?
A. I don't even know what that is.

Mother then explained that she had taken the drug screen and was told that she tested positive for cocaine, but Mother refused to sign it. Mother complained that she was only shown what the caseworker "wrote on the paper" and said "if you're not showing me the cup with the reading on there, you're not showing me anything." When asked if she had used any drugs in the past thirty days, Mother initially said, "No, I have not." However, she later admitted to using marijuana "[m]aybe twice" since the last court date. Mother was asked about the type of "behavior" she was exhibiting in court but insisted that she was dizzy and her sugar was high and that she really did not want to be there. Given the fact that Mother had "done rehab about 12 different times," she was asked if she considered

- 13 -

it appropriate to still "use illegal drugs when you are not actively using." Mother responded, "It's appropriate for me to use marijuana to maintain my sanity and not go to jail. Yes, I think it's appropriate." In fact, she added, "Because right now I wish I had some. You're getting on my nerves just asking me all these stupid questions." When asked if her behavior was appropriate for a courtroom setting, Mother repeatedly stated "I'm over this" and insisted that she had been dealing with the situation for eight years and had "done everything that I needed to do." Mother was asked about her specific objection to the drug screen she had taken that morning and the possibility of taking another one, to which she responded, "I'm not going to take another one. . . . No, I'm not. Okay, and I mean from this point on I'm not."

The next witness to testify was Christesha Young. She had served as Bradford's case manager for the past two years, as the previous case manager had passed away around the time the petition was filed. Ms. Young had reviewed the entirety of Bradford's file, which included some records the team coordinator was able to obtain from the previous caseworker's file, but she admittedly could not attest to whether the previous caseworker included all of his information in the records she had.

Ms. Young testified about the drug test she had administered earlier that morning. She explained that she showed the cup to Mother and reviewed it with her, showing her that there was no line for cocaine, and a very faint line for fentanyl, and so Mother had tested positive for both cocaine and fentanyl. She said Mother told her she had not used but then said "oh, well," and walked away, refusing to sign the drug screen. Ms. Young also testified about the incident involving Mother running out of gas. She said she called Mother that morning and gave her a four-hour window for the drug screen, as her attorney had requested, and Ms. Young offered to either go to Mother's home or meet her. Ms. Young testified that Mother agreed to come to the office, but she later sent her a message stating that she was walking with a gas can, "and she didn't care what steps I did or what I reported, that it wasn't going to be completed." Ms. Young testified that she offered to go to where Mother was, but Mother declined. She said that Mother had also denied her access to her home on other occasions, when Ms. Young would attempt to meet her and Mother would either say "don't come to my home" or try to meet at a different location. She said it was difficult to "keep up with" Mother and that she went to her home about four times when no one was there. Ms. Young did not consider Mother compliant with her requests for drug screens and said she was mostly able to obtain them when Mother came to court. She testified that DCS had "semi-regular" contact with Mother. She said she had reached out to Mother at least once a month, but there were periods of two to three months when she was not able to make contact with her.

Ms. Young testified that Bradford's visits with Mother, while she had been the case manager, had been very short and sporadic. She also said there had not been many visits, even though she and other workers offered Mother visitation. Ms. Young had supervised only one or two visits in the two years she had been on the case. She recalled one instance

- 14 -

in which Mother had attempted to plan something for Bradford's birthday, but "she demanded for things to go a certain way and her way." Ms. Young added, "I feel like that's probably why visitation doesn't occur as often, because she wants it to be her way or no way, and she doesn't want to have to deal with DCS. So she doesn't really visit very often." Ms. Young noted that visits were supposed to be supervised by either DCS or the foster mother. She testified that she and the foster mother had both stressed to Mother that she could reach out to them when she wanted visits, "but that doesn't really occur." According to Bradford's file, Mother's visits to the foster mother's home usually consisted of her pulling up outside for a few minutes to give Bradford something and then leaving. Ms. Young acknowledged, though, that when visits did occur they were positive and that Mother and Bradford spent time "catching up." Still, Ms. Young did not consider "driving by and saying hey" or "a phone call here and there" as sufficient visitation to maintain a bond.

Ms. Young conceded that she and Mother had never had a positive relationship as long as she had been on the case. Ms. Young said she did not consider herself "difficult to work with" and noted that no other parents had said she was. She described herself as very accommodating and not combative. However, she said that it was difficult to have a positive conversation with Mother, as Mother stated multiple times that she did not like Ms. Young and even threatened her physically. Ms. Young explained that Mother once thought that she was "getting smart with her" and said "she'd smack [Ms. Young] in the mouth." Ms. Young testified that when she offered to supervise a visit for Mother, Mother would always say she did not like her or want to see her. She testified that she had never raised her voice with Mother and that she tried to maintain professionalism.

Regarding the permanency plan requirements, Ms. Young testified that she had no documentation to show that Mother had completed anger management, nor did Mother report to her that she did. Mother had informed Ms. Young that she was employed as a caregiver, and Ms. Young knew that Mother had housing. However, Ms. Young testified that she had asked Mother for a check stub and copy of her lease for verification, and Mother had not provided either. Counsel for DCS paused her questioning and said, "just for the record, did [Mother] just say that she's not going to provide that stuff? Is that what she just said?" Ms. Young responded, "That's what it sounded like." Ms. Young testified that Mother had completed a mental health assessment, but Ms. Young was not aware of what the recommendations were. Mother had informed her that she was going to Centerstone for her mental health needs, but Ms. Young had not received any documentation. She said she had asked Mother for a release, but it was not provided.

Ms. Young testified that Mother had completed an alcohol and drug treatment program. She knew that Mother had gone to the residential treatment facility in Florida in 2020 because she had seen the certificate. She noted, however, that Mother continued to test positive on her drug screens, mostly for cocaine. Ms. Young testified that she offered to set up a "new" alcohol and drug assessment for Mother at the last child and family team

- 15 -

meeting. However, she said that anytime she offered Mother services, Mother would always state what she had already completed and what classes she was currently doing and say she did not need any additional help. Ms. Young testified that the goal is for the parent to get the help they need to maintain sobriety, which Mother, based on her drug screen that morning, still had not achieved. Ms. Young explained that there were times over the years when it appeared Mother was "getting it together," but every time she would eventually fail a drug screen, as she could not maintain her sobriety. She was asked, "Is the reason that the same steps were on the plan each year because they had not yet been completed?" Ms. Young responded, "They were completed, and then a relapse happened."

Regarding whether Mother had demonstrated an ability and willingness to assume custody, Ms. Young admitted that "there's definitely a willingness." However, she had concerns about Mother's *ability* to provide for Bradford "if she's under the influence." She also noted what had happened with Bradford's older brother during the trial home visit with Mother. Given that situation, and Mother's flippant attitude about what occurred, Ms. Young had concerns about Mother's ability to supervise Bradford in his teenage years. She also expressed concerns about Mother's mental health and her behavior in court. Finally, Ms. Young noted that Mother was driving without a license and might drive Bradford as well. She was concerned about Mother's disregard for the law, whether it involved driving without a license or marijuana use, noting that she "just doesn't care," even though it placed her at risk of incarceration. In contrast, she noted that Bradford was in a positive environment at his foster home, where he was very well situated, had bonded with the foster family, and was involved in extracurricular activities. She believed it would be detrimental to remove him from the stability of the foster home and his school. She noted that if Mother's rights were terminated, she would still be able to maintain contact with Bradford. Ms. Young believed that contact with Mother was a good thing for Bradford, but she emphasized that contact is very different than returning to Mother's custody. For example, she noted that if Mother is under the influence during a visit, Bradford can easily remove himself from the situation, but if he was placed in her home, he could be put in the position of having to call and tell someone if he observed Mother under the influence.

Finally, Ms. Young testified that Bradford had in the past expressed his desire to be adopted. She explained that they were at court one day when Bradford expressed in front of Mother his desire to be adopted, and when Mother heard his statement, she "was upset and stormed off." Ms. Young testified that Mother's reaction then caused Bradford to cry and get really upset. She testified that ever since that day, Bradford had always said that he wanted to return home to live with Mother, and he also said that he did not want to participate at trial.[4]

---

[4] A DCS case recording summary by Ms. Young from a court date in May 2023 stated, "Today was an emotional day for Bradford. He had to tell the courts and his mother that he wants to be adopted. His mother was very upset. . . . Bradford was emotional about having to go through a trial; however, he still wants to get adopted."

At the conclusion of DCS's proof, Mother's counsel elected to have Mother testify again. Thus, the trial judge directed the parties to return the following week for a fourth day of testimony. When her testimony resumed, Mother testified that she did not choose to become addicted to cocaine and that she was held at gunpoint and forced to use it years ago. Thus, she claimed that she did not "sign up for this" or "choose to be on drugs."

Mother testified that although she had a number of permanency plans throughout Bradford's time in DCS custody, they all stated substantially the same requirements. She explained that, in June 2017, she had walked to Metro Social Services and signed herself up for classes including anger management and life skills. Mother said she completed all of those and gave documentation to a prior caseworker. She testified that she had been in a number of drug treatment programs but acknowledged that the last one was in Florida in 2020. Mother testified that she was generally only asked for drug screens when she was at court. She again said that she had completed a parenting assessment and parenting classes. Mother testified that she was never asked to participate in family counseling with Bradford but that she did participate with two of her older children. She claimed to have emailed a copy of her lease to a previous caseworker. Mother testified that she was paying child support "through workmen's comp" for a period of time. She testified that she had completed mental health assessments at Mental Health Co-op and at Centerstone and followed all recommendations. Mother testified that she was "compliant with Centerstone" and doing "medication management." She testified that she signed every release she was asked to sign by her previous caseworker and denied that Ms. Young ever asked her to sign a release for Centerstone. She also claimed to have signed one at Centerstone giving them permission to speak to Ms. Young.

Mother said she maintained contact with her caseworkers when she could, but her workers changed so often she did not always know who to contact. Upon further reflection, she believed she had nine caseworkers. She was asked to describe the assistance she was given by any of those caseworkers, starting at the beginning. She said, "None of my DCS workers offered me assistance at all. Most of everything that was involved, I initiated. I was already there. I told them about it. They put it in the paperwork as though they were doing their job, but nobody offered me any services." Mother described her relationship with Ms. Young as hostile. She admitted that "things did not start off on the right foot" because their first conversation was about a birthday party Mother planned for Bradford, and Ms. Young told her it was cancelled. Mother said, "I told her she needed to check my resume. She can call the National Guard. We're going to have a party." Regarding the incident involving alleged threats of physical violence, Mother testified that Ms. Young had called her "Hun," so she said, "I'm from the old school. Didn't anybody teach you how to respect your elders? Because back in the day when I was coming up, I'd have hit you in your mouth."

Mother testified that she respected Bradford's foster mother because she is her

"elder" and was also caring for her son, but Mother claimed that she and the foster mother also started having problems after Ms. Young became the caseworker. She said, "I started to just make short visits to make sure that I got to see my son, hug my son, and I made phone calls, and I stayed with him on video." When asked if the reason she had resorted to short visits and phone calls was really that she did not want to be supervised, Mother said, "Amen." Counsel pointed out that a court order required supervision, but Mother said, "I don't care about that court order."

Mother acknowledged that the last school function she had attended was when Bradford was in the sixth grade, but she said that she was very involved when Bradford was in his previous foster home. She testified that if Bradford was placed in her custody, he could use a teen account with Uber to get to school until her driver's license issue was resolved, as she had recently learned that she had to get a "Breathalyzer" in her vehicle for a year. She said the Uber account would allow Bradford to continue attending the same school and all of his games and practices. She testified that she had sufficient income and housing to support him.

Mother believed it was in Bradford's best interest "for DCS involvement to end." Even though she had consistently tested positive for cocaine throughout Bradford's time in DCS custody, she testified that she was not "currently" using cocaine and that she had, for the most part, been successful at using the tools she learned from her treatment programs to stay sober. Mother insisted that she would never use in the home with Bradford. She also claimed that her relapses typically only lasted "a day or two." Thus, Mother said that if she relapsed, someone could take Bradford for a short period of time if she needed to get help or go to treatment. Mother was asked, "If you were given a drug screen today, do you. . . ." She interrupted, "I'm not going to take it. I'm over it." She later reiterated, "I'm not going to test positive for anything today because I'm not taking no test today. I'm really through." When the guardian ad litem brought up the issue again, Mother said, "Go ahead. Make it positive." Mother's counsel suggested that a screen at court would not be admissible anyway, so counsel for DCS suggested that the court order her to go take a screen at a lab. The trial judge then ruled that Mother would be required to submit to a drug screen at a lab, but because the lab was "almost closed" for the day, she would be directed to go on a different date, before the trial court would enter its final order. Mother was directed to "call in every day," and she would be told when to go for the screen. The trial judge cautioned Mother that if she did not go, then it would count as a positive screen.

One month later, in May 2024, Mother filed a motion regarding her lab drug screens. She asked to be excused from missing two screens because she was out of town. In addition, the motion stated that "mother is requesting confirmation of some of the screens that were taken and requests that the court not issue a final ruling until the laboratory issues the confirmation report." According to the motion, Mother was "requesting and paying for confirmation of screens that she believes were incorrect."

- 18 -

In June 2024, Mother filed a motion to reopen the proof because the foster mother, Bradford's adoptive placement, passed away. After a hearing on both motions, the trial court granted in part Mother's motion regarding the drug screens, but only as to the two screens. The trial court granted Mother's motion to reopen the proof only as to the best interest issue. The parties appeared for a fifth day of testimony in August 2024. Bradford was fifteen years old by the time of this hearing. The first witness to testify was the foster mother's adult son, Johnathon, who was in his thirties. He testified that he was Bradford's current foster parent. Johnathon testified that he had been living in the home with Bradford since Bradford was initially placed in the care of the foster mother four to five years earlier. He explained that the house in Nashville where he and his mother had lived actually belonged to him, and that is where he and Bradford continued to live. Johnathon was employed full-time.

Given the difference between their ages, Johnathon acknowledged that he was "somewhat of a brother" to Bradford but also a father figure and male figure in his life. He explained that they could talk sports and music together, and they would practice "lineman moves" together for football. At the same time, Johnathon testified that he helped with whatever Bradford needed, such as picking him up from school or football practices. He said that he had always gone to Bradford's football games, helped when Bradford had questions, and "tried to support him any way that he needed." Johnathon testified that he had also attended at least one band recital, and he planned to continue doing so.

Johnathon testified that he and his mother had discussed Bradford's adoption during her lifetime and talked about her age and a plan for Bradford if something happened to her. He said he decided that he wanted to "keep" Bradford in the event that something happened because he "didn't want him to go anywhere else," and neither did his five-year-old daughter. He explained that Bradford and his daughter have a good relationship, like a brother and sister. Johnathon testified that he had decided to become certified as a foster parent at the beginning of the year and began the online classes. He explained that his mother was still going to be Bradford's foster parent, but he would be able to continue fostering him in the home just in case something happened to her. He testified that he obtained his certification as a foster parent shortly after his mother died and was presently considered Bradford's foster parent. The twin foster children who had also lived in the home had reached the age of 18 and were about to leave for college.

Johnathon reiterated that he wanted to adopt Bradford in the event that option became available. He believed that adoption was in Bradford's best interest based on the last four to five years they had spent together. Johnathon stated that he and Bradford had a positive relationship and enjoyed playing outside and playing video games. He said they had "a mutual kind of understanding." Johnathon explained that he did not have a father in his life when he was growing up because he was also a foster child, although he was eventually adopted by his mother. He testified that his experience pushed him to make

- 19 -

sure that Bradford had the best possible father figure or male figure in his life. He said he could relate to Bradford's situation and was willing to support him in any way he needed going forward. Johnathon testified that he had discussed the future with Bradford, and his opinion about the matter, and he felt that Bradford would be very happy. He also said he was able to provide a safe and stable environment for Bradford. He acknowledged that Bradford communicated with Mother by phone and said he would not end that communication or prohibit visits. The last visit he recalled between Bradford and Mother was a couple of months earlier at his house.

The next witness to testify was Bradford's oldest brother. He was thirty years old and had lived in Chicago since 2017. He testified that he was willing to take custody of Bradford. However, when asked if he presently had a relationship with Bradford, he candidly admitted, "Not as much as I would have liked to but we talk every now and then." The oldest brother testified that he could provide for Bradford, and he believed that Bradford should be placed with family rather than adopted. He said he had previously expressed his interest in obtaining custody of Bradford, but DCS never contacted him. When asked why he never filed a petition in court, he said he had just graduated college and "was trying to get settled myself." The brother had not returned to Tennessee since he moved in 2017, so he had not seen Bradford since then.

Finally, Mother testified once more. She believed it was in Bradford's best interest to be placed with his oldest brother because they were family. She said that the two brothers had lived together for the first five years of Bradford's life, "so they have a bond." She insisted that the family had been deprived of the opportunity to be together. At the conclusion of the testimony and closing arguments, the trial court took the matter under advisement.

The trial court entered a final order terminating Mother's parental rights on September 4, 2024. For reasons that will be discussed in greater detail below, the trial court found that two grounds for termination had been proven by clear and convincing evidence – substantial noncompliance with a permanency plan and failure to manifest a willingness and ability to parent. The trial court also found that termination of parental rights was in the best interest of Bradford. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issues, as we perceive them, for review on appeal:

1.     Whether there was clear and convincing evidence to find grounds under Tennessee Code Annotated section 36-1-113(g)(2) that Mother was in substantial noncompliance with the permanency plan.
2.     Whether there was clear and convincing evidence to find grounds under Tennessee Code Annotated section 36-1-113(g)(14) that Mother failed

to manifest an ability or willingness to personally assume legal and physical custody or financial responsibility for the child and placing him in her custody would pose a risk of substantial harm to the welfare of the child.

3. Whether there was clear and convincing evidence that termination was in Bradford's best interest.

For the following reasons, we vacate in part but otherwise affirm the termination of Mother's parental rights.

### III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023) (citing *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015)). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.   DISCUSSION

### A.   *Grounds for Termination*[5]

#### 1.   **Substantial Noncompliance**

"The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency." Tenn. Code Ann. § 37-2-403(a)(2)(A). The parental termination statute provides that one ground for termination exists if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). The requirements must be "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *Id.*

Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights. *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. Sept. 14, 2012). As the statute clearly reflects, "noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *In re Valentine*, 79 S.W.3d at 548. The analysis "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548; *Dep't of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003)). When analyzing this ground, however, "[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-

---

[5] Mother also raised an issue regarding whether the trial court *properly* found that another ground for termination was *not* sufficiently proven. However, DCS did not raise any issue on appeal regarding that ground. Thus, we need not consider that ground on appeal. *See In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29, 2020) (quoting *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *5 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) ("[W]e do not interpret *Carrington* to mean that this Court must also review grounds that the trial court found were *not* sufficiently proven when the party who sought termination does not challenge that ruling on appeal.")).

- 22 -

COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added); *see, e.g.*, *In re Tamera W.*, No. W2015-01988-COA-R3-PT, 2016 WL 6610359, at *6 (Tenn. Ct. App. Nov. 9, 2016) *perm. app. denied* (Tenn. Feb. 9, 2017) ("[I]t is of no consequence to this ground for termination whether Mother's counseling was successful. Mother's compliance in attending counseling is the relevant consideration."). In other words, "'outcome achievement is not the measure of compliance.'" *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *11).

The trial court made the following findings regarding this ground:

Mother has not *substantially complied* with the requirements in the permanency plans. Mother cannot show completion of any mental health services. There is no proof that she attempted to participate in family counseling. She has shown no documentation of her income. Most importantly, Mother continues to struggle with her illegal substance abuse. Even during the pendency of this matter, she either tested positive for random drug screens or she refused to submit to a screen. The court even set up her drug screens through AverHealth Screens based on her distrust of the DCS case workers. However, she still tested positive for illegal substances. In conclusion, Mother has not *substantially complied* with the permanency plan requirements.

(emphasis added). Although the terms have sometimes been used interchangeably, this Court has clarified that the question, for this ground, is not whether the parent was in "substantial compliance" with the permanency plan. *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *15 (Tenn. Ct. App. May 8, 2018). "Section 36-1-113(g)(2) does not require that a parent 'substantially comply' with a permanency plan." *Id.* "Rather, the appropriate standard is whether there has been 'substantial *noncompliance*.'" *In re Jaylah W.*, 486 S.W.3d 537, 555 (Tenn. Ct. App. 2015) (emphasis added); *see also In re Valentine*, 79 S.W.3d at 548 ("the noncompliance must be substantial"). In *In re Isaiah B.*, the trial court's factual findings referenced both the correct and incorrect standard, making it difficult to determine whether the court applied the correct standard. 2018 WL 2113978, at *15. We reviewed the evidence and reversed the trial court's ruling on this ground given "the confusion regarding the proper standard," the trial court's failure to credit the mother for the steps she did complete, and the testimony of a DCS worker that the mother completed most of the steps required. *Id.* at *17.

More recently, however, this Court has summarily vacated findings of this ground when it was clear that the trial court applied an incorrect standard. In *In re K.W.*, No. M2021-00408-COA-R3-PT, 2021 WL 5783355, at *10 (Tenn. Ct. App. Dec. 7, 2021), we explained:

Here, the trial court's findings indicate that it technically did not apply

- 23 -

the proper standard. In concluding that this ground was established, the trial court stated in relevant part as follows: "Father *has never been in substantial compliance* with the tasks on the permanency plan that are the priorities in this case: substance abuse and mental health. Therefore, Father's parental rights should be terminated on this ground." (emphasis added) The relevant issue is not Father's substantial compliance with regard to the permanency plan. Instead, the appropriate standard is whether there has been "substantial noncompliance." *Id.* at 555; *see also In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (noting that section 36-1-113(g)(2) does not require that a parent "substantially comply" with a permanency plan). Inasmuch as the trial court's reliance on this ground is a product of its written application of a standard not in accordance with the statute, we are compelled to vacate this ground for termination. *See In re Jayden L.*, No. E2020-01668-COA-R3-PT, 2021 WL 2255496, at *3 (Tenn. Ct. App. June 3, 2021) ("Given the concern that arises from these written findings as to whether the trial court actually applied the proper standard in its ultimate disposition, we are compelled to vacate the trial court's order with respect to this ground."). There is certainly a significant breadth of evidence in this case pointing to Father's disinterest in taking steps to work his permanency plan, but as a point of instruction, we remind the trial court again that "[m]eticulous compliance" with the mandates of Tennessee Code Annotated section 36-1-113(k) is required. *See In re Maria B.S.*, [No. E2011-01784-COA-R3-PT], 2012 WL 1431244, at *3 [(Tenn. Ct. App. Apr. 25, 2012)]. The order under review nominally applies the incorrect standard, and as a result, the finding on this ground must be vacated.

*Id.*

In another case in which the trial court applied the wrong standard, we likewise explained:

> Considering a parent's *failure to substantially comply* with a permanency plan, as opposed to substantial noncompliance with the plan, is "an incorrect standard with regard to this ground." *In re Jaylah W.*, 486 S.W.3d 537, 555 (Tenn. Ct. App. 2015). The statute calls for petitioners to show "substantial noncompliance" by parents, not a failure to substantially comply. Tenn. Code Ann. § 36-1-113(g)(2). Here, the trial court's ruling provides that "[t]he Court finds that Petitioners have carried their burden of proof, by clear and convincing evidence, that [Mother] has not substantially complied with the requirements of the permanency plan."
>
> This Court has previously held that when a trial court applies section 36-1-113(g)(2) through the lens of substantial compliance as opposed to

- 24 -

substantial noncompliance, the finding should be vacated. *See, e.g.*, *In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *8 (Tenn. Ct. App. Nov. 9, 2021) (collecting cases and noting that the "[f]ather's failure to substantially comply with the permanency plans is not ... a ground for termination"); *In re Jaylah W.*, 486 S.W.3d at 555 (ruling as to section 36-1-113(g)(2) vacated due to absence of appropriate findings of fact and "the application of an incorrect standard").

Because the trial court applied an incorrect standard in its final order, we deem it prudent to vacate the trial court's ruling as to section 36-1-113(g)(2).

*In re Serenity S.*, No. M2022-01091-COA-R3-PT, 2023 WL 4884040, at *4 (Tenn. Ct. App. Aug. 1, 2023); *see also In re Jamarcus K.*, No. M2021-01171-COA-R3-PT, 2022 WL 3755383, at *11 (Tenn. Ct. App. Aug. 30, 2022) (noting the trial court's finding that the parents had not "substantially complied" with the permanency plan and concluding that "the trial court improperly applied section 36-1-113(g)(2) and that portion of its findings must be vacated").

On the other hand, in *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *6-7 (Tenn. Ct. App. Jan. 26, 2023) *perm. app. denied* (Tenn. Apr. 20, 2023), we concluded that a reference to "substantial compliance" did not require vacating the ground where it was "apparent from the court's analysis that it applied the appropriate standard." Similarly, in *In re Quinton A.*, No. E2024-01678-COA-R3-PT, 2025 WL 1228615, at *6 n.13 (Tenn. Ct. App. Apr. 29, 2025), where the trial court used the phrase "has not substantially complied," we said, "this misstatement does not imply that the trial court applied the correct standard when viewed in light of the trial court's discussion of Father's noncompliance with the responsibilities set out in the plan." We "encourage[d] trial courts to hew closely to the language of the termination statute in their findings" but ultimately concluded that the trial court's "imprecise language" was not a basis to vacate this ground. *Id.*; *see also In re Nickolas K.*, No. M2023-00951-COA-R3-PT, 2024 WL 1069835, at *16 n.18 (Tenn. Ct. App. Mar. 12, 2024) ("In some cases, we have held that doubt as to whether the trial court applied the correct standard required that we vacate this ground for termination. . . . That is not the case here. While the trial court did find that Father 'has not substantially complied with the responsibilities and requirements set out for him,' it also concluded that 'DCS has proven by clear and convincing evidence, the ground of substantial noncompliance with the permanency plan[.]' . . . Thus, we conclude that the trial court's use of imprecise language is not a basis to vacate this ground.").

Here, the trial court's order begins by stating that DCS sought termination on the ground that Mother "failed to substantially comply with the provisions of the permanency plans," which is the incorrect standard. The section of its order regarding this ground for termination contains the heading: "Substantial Non-Compliance with Permanency Plan." However, within that section, the trial court's findings reflect application of the incorrect

standard. The trial court first found that "Mother has not substantially complied with the requirements in the permanency plans." It then stated again, "In conclusion, Mother has not substantially complied with the permanency plan requirements." The order refers to "the ground of substantial noncompliance," but it closes by again stating in its conclusions of law that Mother has "not substantially complied with the provisions of the permanency plans." Therefore, we conclude that the trial court applied the incorrect standard, and its finding on this ground must be vacated. *See, e.g.*, *In re Serenity S.*, 2023 WL 4884040, at *4. Due to our disposition of the other issues on appeal, a remand for reconsideration of this ground is unnecessary.

### 2. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides another ground for termination when:

> A parent [] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

For this ground, two prongs must be proven by clear and convincing evidence: "(1) the parent [] failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Regarding the first prong, the statute "places a conjunctive obligation on a parent [] to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. So, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent [] has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* When considering whether the parent has demonstrated an *ability*, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). For *willingness*, "we look for more than mere words" and consider whether the parent attempted to overcome the obstacles that have prevented him or her from assuming custody or financial responsibility for the child. *Id.* "The analysis of a parent's failure to manifest an ability and willingness to assume custody or financial responsibility focuses on the parent's actions throughout the life of the [c]hild." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *12 (Tenn. Ct. App. Jan. 31, 2023) (citing *In re Neveah M.*, 614 S.W.3d at 677).

At trial, DCS agreed that Mother had demonstrated a willingness to assume custody. However, DCS argued, and the trial court agreed, that Mother had not demonstrated an *ability* to assume custody. The trial court found that even though Bradford does have a bonded relationship with Mother, "she clearly is not in [a] position to assume custody currently." The court acknowledged that Mother had maintained a physical home, but it found that "Mother's demonstrated continued illegal substance abuse has rendered her unable to assume legal and physical custody of the child for more than nine years." The trial court further found that "[t]here is no reason to conclude from the proof that Mother's inability to do so will change in any reasonable time period." The record fully supports these findings. Even though Bradford had been out of Mother's care for nearly a decade, she still had not demonstrated an ability to care for him due to her drug use. *See In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025 WL 1088253, at *11 (Tenn. Ct. App. Apr. 11, 2025) (finding the first prong satisfied where "Mother had clearly failed to remedy her substance abuse problems," she no longer attended therapy, and she "seemed unable to understand the severity of her exhibited behaviors"); *In re Aries S.*, No. E2023-00462-COA-R3-PT, 2023 WL 7276636, at *7 (Tenn. Ct. App. Nov. 3, 2023) ("By her relapses and failed drug tests, Mother has not shown that she is able to remain sober, and further, she has not shown that she is willing or able to complete the steps required for her to assume custody of Aries."); *In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *4 (Tenn. Ct. App. May 16, 2023) (concluding that a parent had not demonstrated an ability to assume custody when she had "repeatedly relapsed," had "a propensity to relapse," and her most recent drug screen one month before trial was positive).

Regarding this ground for termination, Mother argues on appeal that the trial court "should have understood" that addiction is a disease. However, she does not explain how that would change the analysis of her *ability* to care for the child within the meaning of the statute. *See, e.g.*, *In re Cartier H.*, No. M2024-00203-COA-R3-PT, 2024 WL 3594453, at *6 (Tenn. Ct. App. July 31, 2024) *perm. app. denied* (Tenn. Oct. 14, 2024) ("Mother's demonstrated severe and persistent mental illness . . . has rendered her unable to assume legal and physical custody of the children for more than five years."). "Ability and willingness are distinct concepts." *In re Paisley J.*, No. W2022-01059-COA-R3-PT, 2023 WL 4417390, at *10 (Tenn. Ct. App. July 10, 2023). Mother's lifestyle and circumstances show that she does not have the ability to assume custody of the child. Mother also insists that she has demonstrated the ability to care for Bradford because she has a relapse plan. Mother states that she "realizes that she has relapses," but she notes her trial testimony that if she had a relapse while Bradford was in her care, she would "either send him to his brother or someone else" while she sought help. We recognize, however, that one brother was in Chicago, and the other was incarcerated. Thus, Mother's relapse plan does not convince us that she has the ability to care for Bradford.

The second prong of this ground for termination requires a showing, by clear and convincing evidence, that "placing the child in the person's legal and physical custody

- 27 -

would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Malachi M.*, No. E2020-01114-COA-R3-PT, 2021 WL 1140272, at *6 (Tenn. Ct. App. Mar. 25, 2021) (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)).

In this case, the trial court found that Bradford had been placed in a pre-adoptive foster home for over four years and established a strong bond with his foster parent. The court found that Bradford's foster parent had helped him progress with his education and his extracurricular activities, and Bradford had developed a sibling relationship with other children in the home. The trial court found that removing Bradford from his stable home and depriving him of the relationships he had developed with his foster family would have devastating effects on him. Moreover, the trial court found that "Mother still is not in position to provide the child with a safe, stable and appropriate home and care with sufficient means of support free of exposure to the dangerous consequences of Mother's persistent illegal drug use." Thus, the trial court found that removing Bradford from the care of his foster parent and placing him with Mother would pose a risk of substantial harm to his physical and psychological welfare. The record supports these findings as well. Mother had numerous opportunities over the last decade to demonstrate that she can offer a safe and drug-free home for Bradford. She failed to do so.

To the extent Mother argues that her longstanding cocaine addiction does not pose a risk of substantial harm to the child, we disagree, as she continued to test positive for cocaine even on the date of the termination trial. "In evaluating this second prong, this Court has previously placed great emphasis on facts revealing illegal drug use and instability." *In re Paisley J.*, 2023 WL 4417390, at *12; *see, e.g.*, *In re Grace F.*, No. M2023-00344-COA-R3-PT, 2023 WL 8915746, at *12 (Tenn. Ct. App. Dec. 27, 2023) ("The continued drug use by Whitney and Ted leads us to conclude that placing the children in their custody would pose a risk of substantial harm to the welfare of the children."); *In re Airies S.*, 2023 WL 7276636, at *7 ("Mother's history of relapsing and continuing inability to maintain a home for Airies that is free of drug use mean that returning Airies to Mother's custody would pose a sufficiently probable risk of substantial harm to Airies's physical or psychological welfare."); *In re Amayzha L.*, No. M2023-00044-COA-R3-PT,

2023 WL 6122058, at *9 (Tenn. Ct. App. Sept. 19, 2023) ("Father's persistent substance abuse is of great concern and demonstrates an inability to assume custody of the Child"); *In re Zachary F.*, No. E2023-00217-COA-R3-PT, 2023 WL 4994509, at *14 (Tenn. Ct. App. Aug. 4, 2023) ("Father has an unresolved drug problem as evidenced in part by his relapse on fentanyl. Father's relatively recent use of such a dangerous drug poses an obvious danger of substantial harm to the Child were the Child to come into contact with that substance, let alone the fact that Father would be unable to supervise or care for the Child while using such a substance. Father testified that he relapsed in the months before trial because he became 'weak.' There is no assurance in this record that Father will not weaken again and thus endanger the Child. Father's unresolved drug problem including his history with fentanyl and his lack of housing are sufficient bases upon which to conclude [] that returning the Child to Father's custody would pose a risk of substantial harm to the Child."); *In re Riley B.*, 2023 WL 3477216, at *4 ("Mother's positive drug screens coupled with her testimony that she could not effectively parent the children while on drugs, show that placing the children in her custody 'would pose a risk of substantial harm' to the welfare of the children."); *In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022) ("Mother continues to use illegal drugs and drive without a license, creating a likelihood that she will incur additional criminal charges. These issues have been held to create a risk of substantial harm for purposes of this ground for termination."); *In re Daylan D.*, 2021 WL 5183087, at *11 (finding this prong met where "Father's drug issues are ongoing and render his home unsafe"); *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *15 (Tenn. Ct. App. July 21, 2021) (finding a risk of substantial harm where "Mother often cycles through periods of sobriety and stability followed by periods of drug use and instability" and "there is no question that the children cannot remain in the home where any of its inhabitants is using drugs"); *In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *9 (Tenn. Ct. App. Apr. 7, 2021) (finding a risk of substantial harm where a mother had unaddressed issues with housing and employment and "was still using illegal drugs even in the days before the trial that was to determine if her parental rights should be severed"); *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) ("[P]arents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm."); *In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020) ("Naturally, placing the Children with a parent who has not shown the ability and willingness to abide by the law would put them at substantial risk for harm."). Mother argues on appeal that "[t]here were never any findings of abuse or neglect other than the drug addiction," her "parenting skills" have never been at issue, and her only deficiency was positive drug screens. However, Mother fails to mention that one of her children tested positive for cocaine at birth and was declared an abused child, another was adjudicated a sexually abused child, and Bradford's older brother was incarcerated due to his arrest in another state during a trial home visit with Mother, at a time when her parenting skills were under scrutiny. Thus, we do not agree with Mother's suggestion that her parenting skills never led to abuse or neglect or negatively impacted her children. *See In re Azelea B.*, No.

M2023-00656-COA-R3-PT, 2024 WL 657652, at *18 (Tenn. Ct. App. Feb. 16, 2024) (considering as a factor supporting a finding of substantial harm "Mother's history of drug use to the point of perpetrating severe child abuse by exposing the Children [] to drugs *in utero*"). It is fortunate that Bradford was never abused, but again, he has not lived with Mother since the age of five.

We agree with the trial court that the evidence clearly and convincingly establishes that Mother has failed to manifest an ability to care for Bradford. In addition, the evidence is clear and convincing that placing Bradford in Mother's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Therefore, we affirm the trial court's finding that this ground was sufficiently proven.

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) provides, in pertinent part:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another

- 30 -

person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.[6]

In addition, our supreme court has explained:

When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the

---

[6] Mother argues that the trial court's best interest analysis is insufficient because, for most of the factors, "the court did not make specific findings of fact to support the legal conclusion." We acknowledge that the specific portion of the order addressing the best interest factors largely repeats the language of the factors without any findings to explain its decision. For example, for factor one, the order states, "1. It is in the child's best interests for termination to be granted as to the Respondents as the child has a critical need for stability and continuity of placement through his minority." This, standing alone, is not the type of detailed analysis that is required. *See In re Bentley E.*, 703 S.W.3d 298, 304 (Tenn. 2024) ("For each factor, the trial court should make factual findings supporting the application of the factor. In the case at hand, several of the factors set out by the trial court are not supported by factual findings and are instead conclusory statements. Because the trial court's best interest analysis is insufficient, we must . . . vacate the trial court's decision to terminate, and remand for the trial court to enter sufficient factual findings and conclusions of law for the best interest analysis of the parental termination decision."); *In re Austynn F.*, No. E2023-01707-COA-R3-PT, 2025 WL 40469, at *4 n.4 (Tenn. Ct. App. Jan. 7, 2025) (observing that "the trial court's analysis of the child's best interest in some instances only repeats the language of the best interest factors" and directing the trial court on remand to "supplement the factual findings supporting its conclusion that termination of Father's parental rights is in the child's best interests"). However, the section of the order repeating the language of the factors is followed by three paragraphs of additional findings regarding the child's best interest, and the remainder of the order also contains relevant findings. This Court has previously explained,

> While the termination statutes require that the trial court make specific findings of fact, there is no authority indicating that the findings must be in a particular section of the trial court's order. *See In re K.H.,* No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *7 n.6 (Tenn. Ct. App. May 15, 2009). Often the findings of fact supporting the grounds for termination are also relevant to the issue of whether termination is in the child's best interest. So long as the trial court's written order contains findings of requisite specificity that show that termination is in the child's best interest, the fact that the findings are not set out in the "best interest" section of the order does not render the order insufficient.

*In re Adoption of C.A.M.*, No. W2008-02003-COA-R3-PT, 2009 WL 3739447, at *7 (Tenn. Ct. App. Nov. 9, 2009). Thus, "a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the order contains sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision." *In re Jaxon N.*, No. E2024-01405-COA-R3-PT, 2025 WL 1250586, at *11 (Tenn. Ct. App. Apr. 30, 2025) (quoting *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *8 (Tenn. Ct. App. Dec. 4, 2023)). The order in this case, as a whole, contains sufficient findings.

perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 681-82.

We first consider factors regarding emotional needs and attachments.[7] *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect well-being), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the child is fearful of living in the parent's home), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's emotional fitness and its corresponding impacts). The trial court specifically mentioned five of these factors and determined that they weighed in favor of termination. It found that Bradford had a critical need for stability and continuity of placement through his minority, and changing caretakers and physical environment would

---

[7] Appellate courts often "group our discussion of the best interest factors 'based on the overarching themes within the list of twenty factors' . . . because many of these factors touch on similar factual predicates and involve similar issues." *In re Kurt R.*, No. E2023-01108-COA-R3-PT, 2024 WL 4040828, at *13 (Tenn. Ct. App. Sept. 4, 2024) *perm. app. denied* (Tenn. Nov. 27, 2024) (quoting *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023)); *see also In re Quinton A.*, 2025 WL 1228615, at *9; *In re Silvia F.*, No. E2023-00704-COA-R3-PT, 2024 WL 3496302, at *16 (Tenn. Ct. App. July 22, 2024).

likely have a negative effect on his emotional condition. The court found that Bradford does have an attachment to Mother, but it is not a "secure and healthy parental attachment," and there is no reasonable expectation that they can create such an attachment. The trial court found that Mother had not maintained regular visitation or other contact with Bradford, and she failed to use the visitation she had to cultivate a positive relationship, as her visits were not consistent. In contrast, the trial court found that Bradford did create a healthy parental attachment with the current foster parent. It noted that even though Bradford's foster mother had recently passed away, Bradford had developed a healthy relationship with the rest of the family and a strong bond with his foster parent. The court found that Johnathon had been "assisting with the care of Bradford" ever since he was placed in the home, and Bradford was "well-integrated into his foster home" and doing well in school and extracurricular activities.[8] In summary, the trial court found:

> In this case, the child has been in the same foster home for over four years. Although [the foster mother] has recently passed away, her son is willing and able to be a pre-adoptive home for the child. The child has a close and loving relationship with the foster parent and with his foster siblings. The foster parent intends to adopt the child and is willing and able to provide the child with a permanent home. It is in the child's best interest to maintain the continuity of this placement. . . .
>
> . . .
> The child is placed in a foster home where he has developed strong bonds with the foster parent, who wishes to adopt him. He has flourished in the care of his foster parent and the foster parent wishes to adopt him and provide hm [sic] with a loving and safe home. The child deserves to be released from the stigma of being in foster care.

The evidence in the record fully supports these findings.

We next consider the factors regarding physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home exacerbates the child's experience of trauma), (N) (concerning abuse or neglect); (O) (involving the parent's prior provision of safe and stable care to any child), (P) (addressing the parent's understanding of their needs), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). The trial court found that Mother had "failed to demonstrate the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs in which the child can thrive." It also found that she had not demonstrated an understanding of the

---

[8] The trial court noted the testimony of Bradford's brother that he would be willing to take custody of him in Chicago, but it found that the brother had not developed a close relationship with Bradford and did not have a plan for how to care for him in another state far away from his foster family, friends, and school.

basic and specific needs required for Bradford to thrive.  Simply put, the court found that "Mother has not demonstrated that she can manage her illegal substance abuse issues in a manner that would make it safe for any child in her home."  It found that Mother's family had a long history of court involvement, Bradford had not lived with Mother since he was five years old, and he was currently 15.  The court noted that he and his siblings were adjudicated dependent and neglected in 2014 after one of Bradford's siblings tested positive for cocaine at birth and Mother admitted to a long history of drug abuse even at that time.  We note that another child was found to be the victim of sexual abuse.  As it noted with respect to grounds for termination, "[a]lthough Mother has maintained a physical home, . . . [her] demonstrated continued illegal substance abuse has rendered her unable to assume legal and physical custody of the child for more than nine years," and "[t]here is no reason to conclude from the proof that Mother's inability to do so will change in any reasonable time period."  Sadly, "Mother still is not in position to provide the child with a safe, stable and appropriate home and care with sufficient means of support free of exposure to the dangerous consequences of Mother's persistent illegal drug use."  The record supports these findings as well.

Next, we turn to the factors regarding the parents' efforts and adjustment of circumstances.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal).  The trial court found that Mother failed to demonstrate continuity and stability in meeting the child's basic material, educational, housing, and safety needs.  It also found that she "failed to demonstrate a lasting adjustment of circumstances, conduct or conditions to make it safe and beneficial for the child to be in the home," as Mother "continues to engage in illegal drug use, which may render Mother unable to consistently care for the child in a safe and stable manner."  The court found that Mother failed to take advantage of available resources to assist in making a lasting adjustment of circumstances, particularly as it related to her mental health stability and her illegal substance abuse.  It found that she "failed to make a lasting adjustment of circumstances despite reasonable efforts made by DCS to assist."  It also found that Mother "failed to demonstrate any sense of urgency in seeking custody of the child," as he had "been out of his Mother's custody since he was five years old" and was "currently fifteen years old."  In conclusion, the trial court found,

> Mother has not demonstrated any ability to manage her substance abuse issues. Mother has been unsuccessful in effecting a lasting adjustment. As of the date of hearing, Mother has not made any efforts to change her substance abuse treatment in order to improve her condition so that the child could return to her care.

We disagree with the trial court to the limited extent that the court's findings suggest

Mother "has not made any efforts" with respect to her substance abuse treatment or mental health. As previously discussed at length above, Mother testified that she had attended about twelve treatment programs over the years. She also attended mental health treatment. She simply has not maintained sobriety. Having carefully reviewed the evidence, we *do* agree with the trial court's remaining findings regarding these factors. Bradford was removed from Mother's home for nearly a decade. Even though Mother admitted that she had come to expect drug screens whenever she came to court, she consistently tested positive for cocaine over the years, even when she came to court for the termination trial. She even testified at trial that she believed it was appropriate for her, as an addict, to use illegal drugs such as marijuana when she was not "actively using" if it helped her "maintain [her] sanity." She refused to abide by the law by continuing to drive without a driver's license. We also recognize that Mother, by the time of trial, steadfastly refused to participate in further drug screens or cooperate with DCS on various matters, indicating her unwillingness to take advantage of services or resources. When asked if the reason she had resorted to short visits and phone calls was really that she did not want to be supervised, Mother said, "Amen." So, when given the opportunity to attend supervised visits with Bradford and thus maintain a relationship with them, Mother elected not to participate. As such, we agree that these factors weigh in favor of termination of parental rights.

The remaining factor addresses support. *See* Tenn. Code Ann. § 36-1-113(i)(1)(S). DCS stipulated that Mother paid child support. Thus, this factor does not weigh in favor of termination.

Mother argues on appeal that "the most important factor in this case is the preference of the child." She insists that "Bradford's desire to return home to his mother, even if he cannot do so today, should override all other considerations of what is in his best interest." The twenty factors listed in the statute do not mention the preference of the child, but the statute provides that the court "shall consider all relevant and child-centered factors applicable to the particular case before the court" and those factors "are not limited to" the enumerated factors. Tenn. Code Ann. § 36-1-113(i). In another case involving the testimony of children in a termination case, we recently explained:

> One aspect of this case that sets it apart from many other parental termination cases is that Charles presented the trial court with a clear articulation of his feelings about this case and what outcome he desired. There is a fine balance to be drawn in considering that testimony. A trial court cannot allow a child to unilaterally decide the outcome of the best interest analysis, particularly considering that a child's testimony could be inappropriately influenced by outside factors, such as favoritism toward one parent. *See, e.g., In re Taylor A.B.*, No. W2013-02312-COA-R3-PT, 2014 WL 3778749, at *7 n.7 (Tenn. Ct. App. July 31, 2014) (advising "that 'due caution is in order in considering the testimony of a child' on his preference, to guard against factors such as an adult pressuring a child into expressing a particular preference" (quoting

- 36 -

*Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at *18 (Tenn. Ct. App. May 31, 2013))). However, at the same time, "provided the trial court exercises due caution, 'it is permissible, indeed important, to give significant weight to the child's testimony' on his own best interests," particularly if the child is old enough and demonstrates the maturity needed to do so. *In re Taylor A.B.*, 2014 WL 3778749, at *7 (quoting *Maxwell*, 2013 WL 2420500, at *18) ("Under the facts of this case, where Father took the life of the mother of these children, the trial court appropriately considered and respected the children's desire to see Father's parental rights terminated, freeing them to be adopted by the Petitioners. We do as well."); *see also In re Braxton M.*, 531 S.W.3d [708,] 738 [(Tenn. Ct. App. 2017)] (finding no error in the trial court crediting a maternal grandmother's statement that the child "personally told me ... he wants to be adopted and this is where he wants to be, and he, that he loves it at home. He's happy where he's at and he does not want to go with his mother or his father, and he has personally told me that.").

*In re Charles B.*, No. M2024-00360-COA-R3-PT, 2024 WL 5233227, at *27 (Tenn. Ct. App. Dec. 27, 2024) *perm. app. denied* (Tenn. Mar. 17, 2025).

Here, Bradford testified at trial that his "preference" was to return home, but if that was not possible, he was also comfortable remaining in his foster home and being adopted. The trial court clearly took Bradford's testimony into consideration, as it found that he "would eventually like to go home to his mother, [but] he also understands that she is not at a point to care for him now." The trial court also found that "Bradford is comfortable in his current foster home" but "would like to continue to have contact with his mother." We have given careful consideration to Bradford's testimony as well. However, his testimony in front of Mother at trial as to his stated "preference" does not alter our ultimate conclusion as to his best interest in this case, especially in light of Ms. Young's testimony that he had previously expressed a desire to be adopted until Mother became upset and "stormed off," which caused Bradford to also cry and become upset. We reject Mother's argument that his stated preference is the most important factor or should override all other considerations of what is in his best interest. *See id.*

Considering the best interest of Bradford, from his perspective, it is clear that termination of parental rights is in his best interest. As DCS aptly noted in its brief on appeal, "[Bradford] has lingered in foster care for nearly a decade waiting on Mother to finally turn things around. She has not." He should be permitted to achieve permanency after so many years in foster care. Having carefully reviewed the entire record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Bradford. *See In re Neveah M.*, 614 S.W.3d at 680.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is vacated in part, affirmed in part, and remanded. Costs of this appeal are taxed to the appellant, Angela H., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE